Filed 8/12/14  In re D.Y. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re D.Y. et al., Persons Coming Under the Juvenile Court Law. | B253519 (Los Angeles County Super. Ct. No. CK99034) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. R.Y., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Timothy R. Saito, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Acting Assistant County Counsel and Stephen D. Watson, Deputy County Counsel for Plaintiff and Respondent.

# I. INTRODUCTION

The mother, R.Y., appeals from the juvenile court's October 23, 2013 jurisdictional and dispositional findings and orders. She argues there is insufficient evidence to support the jurisdictional orders under Welfare and Institutions Code[1] section 300, subdivisions (b) and (j). In addition, the mother challenges the removal of her two children from her custody. We affirm the findings and orders.

# II. PROCEDURAL HISTORY

On April 17, 2013, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of three-year old D.Y. and seven-month old A.Y. The petition alleged the mother has a history of illicit drug use and is a current marijuana abuser which renders her incapable of caring for the children. The petition also alleged the mother has a criminal history of convictions for possession of marijuana for sale.

At the April 17, 2013 detention hearing, the children were detained in shelter care. The department was ordered to use its best efforts to place the children together. The mother was granted monitored visits after she contacted the department. Later, the adjudication hearing was continued to October 23, 2013 in part because of the mother's incarceration.

On October 23, 2013, the mother made her first appearance in the case at the adjudication hearing. The juvenile court sustained the petition under section 300, subdivisions (b) and (j). The juvenile court found counts b-1 and j-1 to be true: "The [mother] has a history of illicit drug use and is a current abuser of marijuana, which renders the mother incapable of providing regular care of the children. On prior occasions in April of 2013, the mother was under the influence of marijuana in the child,

---

[1] Further statutory references are to the Welfare and Institutions Code.

[A.Y.'s] presence. The mother's illicit drug use endangers the children's physical health and safety, placing the children at risk of physical harm, damage and danger." The children were ordered removed from the mother's custody.

## III. EVIDENCE

### A. Detention Report

The April 17, 2013 detention report stated on April 10, 2013, the department received a referral alleging seven-month-old A.Y. was a victim of general neglect. On April 6, 2013, the mother and her boyfriend, Ivan B., brought A.Y. to Millers Hospital because the child had pneumonia. On April 8, 2013, a day-shift nurse asked the parents if they had fed A.Y. They looked at each other and replied they had not fed A.Y. The caller was concerned because the parents had been given A.Y.'s feeding schedule so they could feed her. The caller reported the parents left the hospital several times and would return smelling of marijuana. In addition, the parents had to be told three times to keep A.Y.'s crib side rail up to prevent the child from falling onto the floor. On April 9, 2013 at 3:30 a.m., the parents argued so loudly that hospital security staff was called. The hospital security staff told the parents they would have to leave the hospital if they continued to argue. The hospital nursing staff observed the parents did not wake up until 2:00 p.m. on April 9, 2013. On April 10, 2013, the caller reported the child's side rail was down again while the parents were out of the room. But the grandfather, who was sitting next to the crib, did lift the side rail up for A.Y.'s protection. A.Y. was scheduled to be discharged on April 10, 2013. However, A.Y. had not yet been discharged because of concerns for her safety.

Later on April 10, 2013, children's social worker Resheda Patterson arrived at the hospital and interviewed the night-shift nurse. The nurse reviewed the nurses' notes and confirmed the foregoing. Also, the parents did not attend to the child, leaving this responsibility to the nurses.

3

Ms. Patterson interviewed the mother. The mother stated the only time the side rail was down was when A.Y. was being held. Or, the side rail would be down while the mother was sitting next to the bed playing with A.Y. A.Y. did not have a current pediatrician because it had taken a month for A.Y.'s medical records to be transferred from Riverside to Long Beach. A.Y. was behind in her immunizations and had not had her four-month or six-month shots. The mother denied not checking on A.Y. And the mother denied she and Ivan slept until 2 p.m. She said: "We had the door closed. They wouldn't know."

The mother admitted she and Ivan left the hospital room to smoke marijuana. She stated, "[W]hat else was I suppose to do[,] I've been here (the hospital) for a week." The mother reported she was "stressed out" and had no other way to relieve her anxiety. She denied having a substance abuse problem. But the mother admitted she smoked marijuana daily saying this was the only way she was able to relieve stress. According to Ms. Patterson, the social worker: "Mother denied she has a substance abuse problem and stated smoking marijuana does not affect her ability to take care of her daughter and stated, 'I'm a good mother.'" The mother agreed to submit to an on demand drug test but declined to participate in an upfront assessment.

The mother, Ivan and A.Y. lived with a family friend, identified only as Ms. Hazel. They shared a room with Ms. Hazel's adult son and his family. The mother could not identify A.Y.'s father. But the mother stated he was not involved in A.Y.'s life. The mother had lived with the maternal grandmother, Margaret Y. But the mother left because she did not get along with her 24-year-old brother, Steven Y. The maternal grandmother was caring for the mother's three-year-old daughter, D.Y. The mother asked the maternal grandmother to care for D.Y. The mother refused to provide information about D.Y.'s father but stated he resides in Texas.

Ms. Patterson also interviewed the mother's boyfriend, Ivan. He denied he was A.Y.'s father but confirmed he has been in the child's life since she was two months old. Ivan stated he fed and played with A.Y., put her to bed, and changed her diapers. Ivan said he was at fault for leaving A.Y.'s crib bed rail down at least two times while the

4

child was in the hospital. Ivan admitted he and the mother left the hospital to smoke marijuana. But Ivan denied they came back to the hospital under the influence of a drug because he thought they were gone long enough to get the smell out of their clothing. Ivan denied he and the mother smoked marijuana often or had a substance abuse problem. Ivan stated he and the mother lived with Ms. Hazel. They slept on the floor and A.Y. slept in her car seat because they did not have a bed.

Ms. Patterson called Ms. Hazel to confirm the family lived with her. Ms. Patterson asked if the family would be able to return to Ms. Hazel's home once A.Y. was discharged from the hospital. Ms. Hazel did not want the family to continue living with her. She stated, "I can't have people living in my house [who do not] want to work and [are] always smoking weed." Ms. Hazel also stated she did not want department employees coming in and out of her home.

On April 11, 2013, Ms. Patterson interviewed the maternal grandmother. The maternal grandmother believed the mother was able to care for A.Y. But the mother, in the maternal grandmother's opinion, would be overwhelmed attempting to also care for D.Y. The mother has a learning disability and had received supplemental security income. However, the mother no longer received supplemental security income because she failed to enroll in school as she agreed to do. The maternal grandmother had been caring for D.Y. since the youngster was born. The mother moved out after she got into fights with her brother, Steven Y.

Ms. Patterson also spoke with the maternal uncle, Steven Y. Steven stated he did not believe the mother was capable of caring for the two children. He explained the mother had bad decisionmaking skills. Steven said: the mother was currently on probation but had not checked in with the probation officer; he kicked the mother out of the home for assaulting him with scissors; he and the maternal grandmother have cared for three-year-old D.Y. full-time and had done so since the child was born; and the mother refused to provide any money, clothes, or food for D.Y. Steven admitted he and the mother did not get along. But Steven explained it was because the mother did not

5

want to listen to anyone else. Steven stated: "[S]he doesn't want to pay rent. All she wants to do is smoke up all her money."

The mother's boyfriend, Ivan, convinced her to participate in an upfront assessment so they could get emergency funding for a motel. On April 11, 2013, the upfront assessor obtained temporary housing for the family at a motel for the next seven days. The upfront assessor recommended: the mother complete psychiatric and psychological evaluations; participate in a comprehensive substance abuse evaluation; participate in individual therapy; and enroll in parenting classes.

On April 13, 2013, Ms. Patterson went with a Long Beach police officer to the mother's motel. The officer determined the mother had a $50,000 felony warrant. Also, Ivan had a "no bail" warrant. Both the mother and Ivan were arrested. The mother explained she was on probation in Riverside County but did not know she had a warrant out for her arrest. The arrest record showed the mother was 19 years old at the time of the arrest. The detention report stated the mother was convicted of possession of marijuana for sale on February 1, 2013. She served 90 days in county jail and was placed on three-years' probation. All of the adults living with the maternal grandmother were subjects of arrest warrants.

## B. Jurisdiction/Disposition Report

The June 3, 2013 jurisdiction and disposition report was prepared by dependency investigator Jonathan Halperin. The report indicated A.Y. and D.Y. were placed in separate foster homes. The mother was incarcerated and charged with a violation of Penal Code section 245, subdivision (a)(1)—assault with a deadly weapon other than a firearm. In addition, she was charged with a violation of Penal Code section 4573— bringing a controlled substance into a prison or jail. On April 25, 2013, Mr. Halperin spoke with the mother about the petition's allegations. The mother stated: "True. For my kids, I'm going to give it [marijuana] up. Whatever I have to do to get my kids back." The mother was not participating in any programs in jail. Mr. Halperin suggested

6

the mother look into a parenting program and drug counseling classes if the jail offered them. The report stated the mother had not visited with the children because of her incarceration.

Mr. Halperin recommended the court sustain counts b-1 and j-1 of the petition as to the mother. He recommended the mother receive family reunification services not to exceed six months. Mr. Halperin also recommended the mother be ordered to participate in: a parenting program; drug counseling; random drug testing; and individual counseling. In addition, he recommended the mother receive monitored visits with the department having discretion to liberalize the visits.

## C. Last Minute Information For The Court Documents

The July 24, 2013 last information for the court document indicated the children were placed together in the home of a relative on July 19, 2013. The September 5, 2013 last minute information for the court document states the mother was convicted of violations of Penal Code sections 245, subdivision (a)(1) and 4573. The mother's projected release date was February 11, 2014. The October 23, 2013 last information for the court document stated the mother was released from jail on probation on October 16, 2013. Mr. Halperin spoke with the mother by phone on October 17, 2013. The mother reported she was staying with a friend and searching for a place to live.

## IV. DISCUSSION

### A. Standard Of Review

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re R.C.* (2012) 210 Cal.App.4th 930, 940; *In re E.B.* (2010) 184 Cal.App.4th 568, 574-575.) We review a removal order for substantial evidence in the light most favorable to the juvenile court's order to determine whether sufficient, clear and convincing evidence

7

supports the court's findings. (*In re T.V.* (2013) 217 Cal.App.4th 126, 135; *In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.) Substantial evidence is relevant evidence which adequately supports a conclusion. It is evidence which is reasonable in nature, credible and of solid value. (*In re R.C., supra,* 210 Cal.App.4th at pp. 940-941; *In re E.B., supra,* 184 Cal.App.4th at p. 575.) We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court and adhere to the principle that issues of fact, weight and credibility are the provinces of the juvenile court. (*In re R.C., supra,* 210 Cal.App.4th at p. 941; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)

### B.  Jurisdictional Findings

Section 355, subdivision (a) provides:  "At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300.  Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence.  Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300. . . ."  Section 300, subdivisions (b) and (j) state:  "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  [¶]  (b)  The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . .  [¶]  (j)  The child's sibling has been abused or neglected as defined in subdivision (a), (b), (d), (e), or (i), and there is substantial risk that the child will be abused or neglected, as defined in those subdivisions. . . ."  To establish jurisdiction under section 300, subdivision (b), the department must prove by a preponderance of the evidence that:  there was neglectful conduct by the parent in one of the specified forms; causation; and "serious physical harm or illness" to the child or "substantial risk" of such

8

harm or illness. (*In re B.T.* (2011) 193 Cal.App.4th 685, 692; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 567.)

The mother argues there is insufficient evidence to support the juvenile court's jurisdiction under section 300, subdivisions (b) and (j). The mother concedes she smoked marijuana but contends the department failed to present evidence of ongoing substance abuse. The mother argues on April 25, 2013 she resolved to stop using marijuana. She faults the social workers for not following up to see if the mother kept her promise. These arguments, given the deferential standard of review, are frivolous.

The jurisdictional findings under section 300, subdivision (b) and (j) are supported by substantial evidence. The mother smoked marijuana daily stating this was the only way she was able to relieve her stress. In her interview with Mr. Halperin on April 25, 2013, the mother admitted the allegations in the petition were true. The mother, Ivan and A.Y. had lived with a family friend, Ms. Hazel. But Ms. Hazel no longer wanted the family to stay with her. Ms. Hazel explained, "I can't have people living in my house [who do not] want to work and [are] always smoking weed." The maternal uncle, Steven, stated: "[The mother] doesn't want to pay rent. All she wants to do is smoke up all her money."

The mother contends smoking marijuana did not affect her ability to care for the children. But while seven-month-old A.Y. was in the hospital, the mother neglected the child. The mother had to be told three times to keep A.Y.'s crib side rail up to prevent the child from falling onto the floor. In addition, the mother did not feed A.Y. This basic parenting failure occurred even though the mother was given a feeding schedule for A.Y. On April 9, 2013 at 3:30 a.m., the mother and Ivan argued so loudly that hospital security staff had to be called. The mother did not attend to A.Y., leaving this responsibility to the nurses. The mother admitted neglecting to ensure A.Y. was properly immunized. A.Y. had not received her four-month or six-month shots.

The mother also was unable to care for three-year old D.Y. The maternal grandmother said the mother could care for A.Y. but not both children. The maternal uncle, Steven, stated he did not believe the mother was capable of caring for A.Y. or D.Y.

9

Steven and the maternal grandmother stated they had cared for D.Y. full-time and had done so since the child was born. The mother refused to provide any money, clothes, or food for D.Y. The mother told the family they would have to provide for D.Y. as best they could.

The mother asserts the department did not present any evidence of ongoing substance abuse. But the mother was incarcerated from April to October 2013. The mother was arrested on April 13, 2013 because she had a $50,000 felony warrant. The mother was sentenced and convicted for violations of Penal Code sections 245, subdivision (a)(1), assault with a deadly weapon, and 4573, bringing a controlled substance into a jail. The mother was not released from jail until October 16, 2013. During her incarceration, the mother did not participate in any parenting or drug counseling programs. Mr. Halperin suggested the mother attend parenting and drug counseling programs if the jail offered them but the mother did nothing.

The mother admits the juvenile court struck the allegation she had a criminal history of convictions for possession of marijuana for sale. But she asserts the department's reiteration of the "baseless allegation" in the reports and hearings is evidence of some bias. We disagree the criminal history allegation is baseless. The detention report stated the mother was convicted of possession of marijuana for sale on February 1, 2013. She served 90 days in county jail and was placed on three-years' probation. On April 11, 2013, the maternal uncle reported the mother was on probation but had not checked in with the probation officer. Thus, there is evidence the mother had a conviction for possession of marijuana for sale. The mother's acute narcotics dependence is also demonstrated by her daily use when she is not incarcerated.


C. Removal Order


Section 361, subdivision (c)(1) provides: "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and

10

convincing evidence of any of the following circumstances . . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . ." Section 361, subdivision (d) states: "The court shall make a determination as to whether reasonable efforts were made to prevent or eliminate the need for removal of the minor from his or her home . . . . The court shall state the facts on which the decision to remove the minor is based." The purpose of section 361, subdivision (d) is to avert harm to the children. The parent need not be dangerous nor the child actually harmed before removal is appropriate. (*In re T.V., supra,* 217 Cal.App.4th at pp. 135-136; *In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) The juvenile court may consider both the parent's past conduct and the present circumstances. (*In re Cole C., supra,* 174 Cal.App.4th at p. 917; *In re S.O.* (2002) 103 Cal.App.4th 453, 461.) We review the removal order for substantial evidence. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 105; *Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1078.)

The mother challenges the removal of the children from her custody. She contends she resolved to stop using marijuana and there is *no* evidence she broke that promise. But the mother was incarcerated from April 13 until October 16, 2013 so there is *no* evidence she voluntarily stopped using marijuana. Before her arrest, the mother admitted she smoked marijuana daily. The mother was unable to care for D.Y., leaving the child to be raised by the maternal grandmother and uncle. While A.Y. was in the hospital, the mother failed to feed the child. The mother also did not make sure the crib rail was up to prevent A.Y. from falling onto the hospital floor. The mother did not attend to the child but would leave the hospital room daily to smoke marijuana. During her incarceration, the mother did not participate in any parenting or drug counseling programs. After her release, the mother told Mr. Halperin she was staying with a friend while searching for a place to live. There is no evidence the mother was ready to have her two children returned to her custody. The maternal grandmother stated the mother

11

could care for A.Y. but would be unable to care for both children. The maternal uncle did not believe the mother was capable of caring for either child. Substantial evidence supports removal of both children from the mother's custody.

## V.  DISPOSITION

The jurisdictional and dispositional findings and orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

KRIEGLER, J.